145 So. 546

## WHEELER v. TURLICH.

No. 28868.

Jan. 3, 1933.

Olivier S. Livaudais, of New Orleans, for appellant.

Daniel A. McGovern, Jr., of New Orleans, for appellee.

ST. PAUL, J.

This is an action to annul a marriage on the ground that plaintiff's consent thereto was not freely given. The case is thus stated and disposed of by the district judge, to wit:

### I.

### (Reasons for Judgment)

The plaintiff in this case, a thin, frail, timid-looking youngster to-day, must have been very much more so four years ago, when he was a boy of eighteen years [at time of the marriage]. He is the sole support of a frail, indigent-looking mother, and he has been working to support her since he was thirteen years old; and the character of his mentality and physique is shown by his employment in a can factory, working among young girls.

His story is, he met this girl in the can factory where they were both employed; that he never had any relations with her of any kind or nature, and he never visited her home; and the only time he ever went to her house was on two or three or four occasions, where at a neighborhood picture show, she knowing him, asked him to take her back home when the show was over, and he took her to her gate and left her there.

Now the mother of the boy states that she never knew of the existence of Evelyn Turlich until one day a Mrs. Victory, in company of Evelyn, came to her home to tell her that Evelyn was pregnant and charged the pregnancy to her son. She was shocked, and, on the return of her son to the house, she told him of it, and he denied all guilt of it whatever, and agreed with his mother to go to the Turlich home that evening to make clear to them his innocence. The mother of the boy testified that, when she and her son reached the Turlich house, there was an assembly of the clan; and, as soon as they got inside, Matt Turlich, about three years older than Wheeler, surrounded by this clan, told him, if he did not marry his sister Evelyn, that he would never leave that house alive.

The boy protested his innocence, but they would not listen to him. It was marry her or be killed, and they piled him on a street car down to Judge Gowland in St. Bernard, married her, and came back; and he has had nothing to do with the girl from that day to this. Of course, he has no witnesses other than his mother. How could he have any other witnesses? Where would he produce them?

Now here comes the other side with a unanimity that is simply marvelous. Every one of them said the boy was visiting the girl at her house for ten months, and yet the girl herself, when asked how the period of ten months was arrived at, could not tell; so it is plain to me that the ten months was agreed on by them. The witnesses were separated, and they, with marvelous similarity, stated that the boy came there with his mother and wanted to be married, and there was not the slightest ripple of any unpleasant

happening on that mirror-like surface. No jar, no threats, only a fierce desire on the part of this boy to be married.

But Matthew Turlich "spilled the beans." He told, as far as he would go, but he said enough, that Wheeler was protesting his innocence, stating he was not the cause of the girl's condition, but another man was; and wanted to fight him over it.

Now that is this marvelous Lochinvar, this Romeo, fiercely desiring to be married, denying that he is the cause of the girl's condition, and alleging another man was responsible for it; and Matthew then admitted to me he told Wheeler he had to marry his sister. Falsus in uno, falsus in omnibus.

It is plain this whole story was made up by the Turlich family and its associates, but it was completely shattered by Matthew, who broke the mirror and let in the light; and it is clear that all the witnesses who testified to this compatible, quiet congregation in the Turlich home, were not telling the truth; and it is also plain that Matthew did not go out of his way when he told me that, when this boy denied his guilt, he told the boy he would have to marry his sister. He sank the ship.

The boy's case is clearly made out, and there will be judgment for the plaintiff as prayed for.

## II.

The marriage took place on January 27, 1923; a child was born to the defendant on July 11th of the same year; this suit to annul the marriage was filed on August 10, 1926.

Defendant urges that the annulment of the marriage would cast a stigma on the legiti-

macy of the child; that, although her child was born before the 180th day after the marriage (Rev. Civ. Code, art. 186), yet plaintiff cannot contest its legitimacy, because he knew at the time of the marriage that she was then pregnant (Rev. Civ. Code, art. 190), and because, moreover, he did not, though living in the place where the child was born, contest its legitimacy within one month after its birth (Rev. Civ. Code, art. 191). Hence, she says, the legitimacy of the child is now conclusively settled; and, if the child be legitimate, it necessarily follows that the marriage must be valid. This is in substance the argument, as we understand it, advanced orally but not covered by brief.

### III.

The reasoning is unsound. For the presumption of paternity established by Rev. Civ. Code, arts. 184, 190, 191, results only from proof of *a valid and existing marriage,* since without a marriage proved the presumption has no basis to rest upon. A presumption *arising only out of a marriage* cannot serve as proof of the marriage itself out of which alone it arises. Thus, where a child was born to a woman whose husband had become an absentee, the child was not permitted to invoke the presumption of paternity without first proving that at the time of conception the man was still alive; that is, without first proving that she was still a married woman at the time of conception. Court of Cassation, December 19, 1906; Dalloz, Journal du Palais, vol. 1907, part 1, p. 289.

### Decree.

For the reasons assigned, the judgment appealed from is affirmed.